466 So.2d 1079 (1984)
AMERICAN CYANAMID COMPANY, Appellant/Cross Appellee,
v.
Lester K. ROY, Appellee/Cross Appellant.
No. 82-2196.
District Court of Appeal of Florida, Fourth District.
December 19, 1984.
Rehearing Denied May 1, 1985.
*1081 Paul R. Regensdorf of Fleming, O'Bryan & Fleming, Fort Lauderdale, for appellant/cross appellee.
Don Lacy, Tallahassee, and Earle Lee Butler, of Butler & Pettit, P.A., Fort Lauderdale, for appellee/cross appellant.
GLICKSTEIN, Judge.
American Cyanamid Company appeals a final judgment entered in the Broward County circuit court on a special verdict of the jury awarding Lester K. Roy compensatory damages assessed at $292,000 and punitive damages of $45,000, and his wife, Lucille Roy, $12,500 for loss of consortium. The jury found that American Cyanamid had marketed its product, AM-9, a chemical grout, used in sealing sewer lines and with which Roy had worked, with a defect, by reason of a defective warning, and that the defect was a legal cause of damage to the Roys. They found American Cyanamid had negligently caused the damage, had also committed a fraud or misrepresentation, and had acted with malice, moral turpitude, wantonness or with reckless indifference to the rights of others. The jury also found that Roy had been negligent in his use of the product, apportioning the fault 70% to American Cyanamid and 30% to Roy. The final judgment incorporated the jury's special verdict. Roy cross appeals that portion of the final judgment which applies the comparative fault percentages to the compensatory damages awards.
American Cyanamid contends on appeal the court should have granted the defendant's motions for a directed verdict on the issue of punitive damages and on the wife's claim of loss of consortium, and should have granted a new trial on Mr. Roy's compensatory damages or remitted his compensatory damage award. In support of his cross appeal Roy contends comparative negligence should not apply where the tortfeasor's conduct was willful and wanton or reckless. Upon careful consideration, we affirm.

PUNITIVE DAMAGES
A directed verdict must be granted the moving defendant where the plaintiff's evidence as a whole, together with all reasonable inferences that may be drawn from it, cannot, as a matter of law, prove the cause of action alleged in the complaint. Cooper v. Atlantic Coast Line *1082 Railroad Company, 187 So.2d 673 (Fla. 1st DCA), cert. denied, 194 So.2d 617 (Fla. 1966). In Florida, punitive damages may be awarded by the jury when tortious injuries to the plaintiff result from conduct of the tortfeasor that reflects fraud, actual malice, or deliberate violence or oppression, or is so willful or grossly negligent as to indicate wanton disregard of the rights of others. Johns-Manville Sales Corporation v. Janssens, 463 So.2d 242, 247 (Fla. 1st DCA 1984); Winn & Lovett Grocery Company v. Archer, 126 Fla. 308, 171 So. 214 (1936). The object of punitive damages is to punish the defendant and by his example deter him and others from similar future conduct. Janssens, 463 So.2d at 247; St. Regis Paper Company v. Watson, 409 So.2d 75 (Fla. 1st DCA 1982), reversed on other grounds, 428 So.2d 243 (Fla. 1983). The Florida Supreme Court stated the standard to be met to justify the imposition of punitive damages on a defendant in Carraway v. Revell, 116 So.2d 16, 20 n. 12 (Fla. 1959) and recently reiterated it in White Construction Company v. Dupont, 455 So.2d 1026 (Fla. 1984):
The character of negligence necessary to sustain an award of punitive damages must be a "gross and flagrant character, evincing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects, or there is that entire want of care which would raise the presumption of a conscious indifference to consequences, or which shows wantonness or recklessness, or a grossly careless disregard of the safety and welfare of the public, or that reckless indifference to the rights of others which is equivalent to an intentional violation of them."
As our First District peers pointed out in Janssens, the requisite ill-intent need not actually be proven, but can be inferred from the defendant's willful course of action reflecting wanton disregard of the potential harm likely to result from its conduct. 463 So.2d at 247.
As early as 1958 the Florida Supreme Court recognized the duty of the manufacturer or distributor of a product that is burdened with a latent, inherent danger, to give adequate warning of that danger. Tampa Drug Company v. Wait, 103 So.2d 603, 608 (Fla. 1958). To warn adequately, the product label must make apparent the potential harmful consequences. The warning should be of such intensity as to cause a reasonable man to exercise for his own safety caution commensurate with the potential danger. Id. at 609. Whether the theory of the cause of action is strict liability or negligence, a manufacturer's failure to give adequate warning of the danger posed by a product defect can give rise to an award of punitive damages if the jury finds its conduct sufficiently egregious. Piper Aircraft Corporation v. Coulter, 426 So.2d 1108 (Fla. 4th DCA), pet. for rev. denied, 436 So.2d 100 (Fla. 1983).
In the instant case, each twenty-five pound sack of the product, AM-9, bore the following warning, which by its composition, type or color did not particularly call attention to itself:
Contains Acrylamide. Warning: Repeated skin contact, inhalation or swallowing may cause nervous system disturbances. Do not get in eyes, on skin, on clothing. Do not breathe dust. Wash thoroughly after handling. Wear clean work clothes daily. In case of contact, immediately flush eyes or skin with plenty of water. Wash contaminated clothing before reuse.
Arguably, a sign bearing a similar legend was posted on or in the trucks used in the preparation and application of the sealing compound or mixture of which AM-9 was a major ingredient, though the sign was constantly obscured by the coat of acrylamide dust that always covered the equipment. Roy worked with the product over several years, and generally conformed to the caveats contained in the warning, although he had no protection from inhaling the substance. He learned to mix the material on the job without formal instruction. Neither the manufacturer nor Roy's employer *1083 ever gave safety instruction respecting the dangers of contact with AM-9.
It is evident the manufacturer and the industry became increasingly aware over time of the dangerous consequences of exposure to AM-9. There were empirical data concerning effects on exposed workers, as well as experimental data from laboratory exposure of rats. One expert witness said that laboratory rats did not die from the central nervous system effects of their contact with AM-9, but from being unable to drag themselves to the food. Starvation, not paralysis, was their cause of death! Severe dermatitis, neuropathy and ataxia have occurred in some people extensively exposed to AM-9. An insidious effect of such exposure is apparently irreversible demyelinization of axones in the peripheral nervous system. An expert defense witness stated the warning on bags of AM-9 should make clear that acrylamide is a contact poison, and that brain and nerve damage can result from repeated exposure.
Appellant American Cyanamid contends that to justify punitive damages in a product liability case there must be a smoking gun  e.g., covered up records, or coerced employees at defendant's headquarters. Above citations to the pertinent law show that this is not a requirement. It is true that cases involving design defects usually have facts fitting such a characterization, but even in that kind of case the manufacturer's knowledge of the danger resulting from the defect and his choice not to correct it may be derived by reasonable inference. See American Motors Corporation v. Ellis, 403 So.2d 459, 468 (Fla. 5th DCA 1981), pet. for rev. denied, 415 So.2d 1359 (Fla. 1982).
American Cyanamid also raises a form of state of the art argument based on the fact its warning was sufficient under the guidelines of the Manufacturing Chemists Association, which classifies acrylamide as a toxic rather than a highly toxic substance. We think that following industry guidelines will not absolve a manufacturer from liability in a negligence suit if its knowledge or constructive knowledge goes beyond the facts on which industry standards or guidelines were based, and that the manufacturer's knowledge or imputed knowledge is irrelevant in a product liability suit. See, e.g., Jackson v. Coast Paint and Lacquer Company, 499 F.2d 809 (9th Cir.1974); Freund v. Cellofilm Properties, Inc., 87 N.J. 229, 432 A.2d 925 (1981); cf. Karjala v. Johns-Manville Products Corporation, 523 F.2d 155 (8th Cir.1975). In the instant case the cause of action sounded in both negligence and product liability. When it comes to punitive damages, however, as contrasted with mere liability, we cannot envisage the level of intent or conscious indifference required to impose punitive damages, absent knowledge or opportunity to know. Nevertheless, industry guidelines are of dubious significance when they lag behind current knowledge.
We think the facts in the instant case, some of which we have summarized, were sufficient to justify submission of the issue of punitive damages to the jury, which could reasonably infer the manufacturer's reckless disregard or wanton indifference, when its warning persisted in understating the risks attached to the use of AM-9.

LOSS OF CONSORTIUM DAMAGES
Appellant's contention that there should have been a directed verdict on the wife's loss of consortium claim is based on the rule of law that one cannot marry into a lawsuit. The appellant contends that Roy's injury, if any, resulted entirely from exposure to AM-9 that occurred prior to the marriage. There was, however, testimony that Roy's exposure to AM-9 continued for a short period after the marriage, and that even after his promotion to foreman of the grouting crew he had to work directly with the product whenever problems arose in the grout's mixing or application. Existence of such evidence justified submission to the jury of the issue of compensation to Mrs. Roy for loss of consortium. The jury could reasonably have concluded that Roy's post-marital ill-health and *1084 impotence resulted in some measure from post-marital exposure to AM-9.

COMPENSATORY DAMAGES
Appellant American Cyanamid contends new trial should have been granted on the issue of the amount of compensatory damages to Mr. Roy, or that there was cause for remittitur, on a variety of grounds: (1) Compared with the size of the award, Roy's medical costs were minuscule; (2) It was not shown Roy's earning capacity was reduced, let alone destroyed, as a result of his injury from exposure to AM-9; (3) Roy's skin condition was overcome by treatment, and impairment of his nervous system was not proven. Appellant also argues that the amount of the compensatory damages award reflects prejudice on the part of the jury engendered by its being informed, in connection with the punitive damages claim, of the depth of American Cyanamid's pocket. As already discussed, appellant argues the punitive damages claim should never have gone to the jury.
It is true that Roy's medical expenses were relatively small and that the medical testimony most favorable to him rated his disability attributable to AM-9 exposure at only ten percent. On the other hand, there was evidence of symptoms that could indicate some level of neuropathy and ataxia. There was testimony he could not stand exposure to the sun, could not do much even around the house, and could not drive a car. Roy kept a prison job for only a day and a half because his feet gave out. Roy sought damages not merely for medical expenses and loss of earnings and earning capacity resulting from his injury, but also for pain and suffering, disfigurement and loss of enjoyment of life.
Our companion court has recently recalled in Janssens the restrictive principles governing review of a trial court's order denying a new trial and remittitur:
The correctness of the jury's verdict is strengthened when the trial judge refuses to grant a new trial or a remittitur. The appellate court may review the trial court ruling only for an abuse of discretion.
Two factors unite to favor a very restricted review of an order denying a motion for new trial on ground of excessive verdict. The first of these is the deference due the trial judge, who has had the opportunity to observe the witnesses and to consider the evidence in the context of a living trial rather than upon a cold record. The second factor is the deference properly given to the jury's determination of such matters of fact as the weight of the evidence and the quantum of damages.
The appellate court should not disturb a verdict as excessive, where the trial court refused to disturb the amount, unless the verdict is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate.
463 So.2d at 257 (quoting Lassitter v. International Union of Operating Engineers, 349 So.2d 622, 627 (Fla. 1976)). The general rule, where a prior denial by the trial court of new trial and remittitur is not involved, is that damages in tort are to be measured by the jury's discretion, and, when a verdict is challenged as excessive, should not be disturbed unless so inordinately large as obviously to fall outside the reasonable range. Bould v. Touchette, 349 So.2d 1181, 1184-85 (Fla. 1977). The jury is not legally bound to make a mathematically precise and minimal award, and may take into account, even if it was never mentioned at trial, the anticipated effects of future inflation. Id. at 1185-86. In the instant case appellant has not sufficiently sustained the burden of showing the verdict is unsupported by the evidence. See id. at 1184.
Appellant has also fallen short of showing the jury was influenced by prejudice. See id. There is indeed always a danger a jury may succumb to the deep pocket syndrome when it learns the depth of the defendant's pocket. That such was the case here cannot reasonably be inferred *1085 when one measures the amount of the award against American Cyanamid's net worth. By that standard, the damage award is almost microscopic. The trial court did not abuse its discretion when it denied the motion for new trial and remittitur.

COMPARATIVE NEGLIGENCE
In his cross appeal Roy opposes the reduction of the compensatory damage award by the percent of fault attributed to him. Roy contends comparative negligence ought not to apply when the jury has found the defendant's conduct willful and wanton, and not merely negligent.
It is true, as Roy points out, that historically contributory negligence of the plaintiff was no defense to what was formerly piquantly styled "willful negligence." E.g., Florida Southern Railway Company v. Hirst, 30 Fla. 1, 11 So. 506 (1892); National Car Rental System, Inc. v. Holland, 269 So.2d 407 (Fla. 4th DCA 1972), cert. denied, 273 So.2d 768 (Fla. 1973). It is also true, as Roy states, that Florida's contribution among tortfeasors statute, section 768.31, Florida Statutes (1983), denies willful joint tortfeasors the right to contribution. However, we think inappropriate the analogies Roy is attempting to make. In the first instance, the plaintiff's contributory negligence was formerly a complete defense to the defendant's liability for ordinary negligence. That defense had a far harsher impact on the plaintiff than apportioning damages according to comparative fault. In the second instance, the rationale for contribution among joint tortfeasors is not the same as for damage awards to tort victims.
Among the policy objectives of compensatory damage awards under tort law are to eliminate avoidable injuries and to allocate the cost of injuries that do occur to the beneficiaries of the product or service in connection with which the injuries occur. Not every case lends itself to the furtherance of both of these objectives. Nevertheless, we think that as an incentive for care on the part of potential tort claim plaintiffs, the comparatively negligent plaintiff should bear his fair share of the loss even where the defendant tortfeasor's conduct has been egregious. As we have seen in the present case, punitive damages may be assessed where the defendant's misconduct was willful and wanton. We do not think the defendant manufacturer (and ultimately the final consumers of the product) should be in the position of paying not only actual damages attributable to the manufacturer and punitive damages because of its egregious conduct but also the damages arising from the plaintiff's own negligent conduct.
The judgment of the trial court is affirmed.
ANSTEAD, C.J., and BARKETT, J., concur.

ON REHEARING
PER CURIAM.
The appellant's petition for rehearing and suggestion of question of great public importance are hereby denied. The appellant's motion to strike appellee's response and motion for attorney's fees is denied except as to appellee's request for attorney's fees which is stricken.
GLICKSTEIN and BARKETT, JJ., concur.
ANSTEAD, C.J., dissents in part with opinion.
ANSTEAD, C.J., dissenting in part:
Upon reflection I believe we made a mistake in approving the award of punitive damages against appellant. The facts simply do not reflect the kind of flagrant misconduct that would justify a finding of willful and wanton disregard for the safety of persons such as the appellee. I would also grant appellant's motion to strike appellee's response which I consider to be impertinent and unprofessional.