Joseph Bryan MARZULLO, and his parents, Joyce Marzullo and Ronald Marzullo, Plaintiffs,

v.

CROSMAN CORPORATION, Defendant.

No. 8:01–CV–2053–T–27TBM.

United States District Court, M.D. Florida, Tampa Division.

July 24, 2003.

---

Roy D. Wasson, Law Office of Roy D. Wasson, Miami, FL, Karen A. Gievers, Gievers, P.A., Tallahassee, FL, for Plaintiffs.

Edward W. Gerecke, Carlton Fields, P.A., Tampa, FL, Steven E. Danekas, Swanson, Martin & Bell, Chicago, IL, for Defendant.

## *ORDER*

WHITTEMORE, District Judge.

**BEFORE THE COURT** is Defendant's Motion for Summary Judgment (Dkt. 79) and Plaintiffs' Memorandum in Opposition (Dkt. 84). Upon consideration, Defendant's Motion is granted.

On April 4, 1999, while walking down a street with friends, Joseph Bryan Marzullo was shot by Lalainia Routh, age 17, with a Crosman 2100 Classic air rifle ("Crosman 2100" or "BB gun") resulting in serious injury to Marzullo. Routh intentionally shot the BB gun knowing it could cause injury. Plaintiffs contend that the Crosman 2100, which was designed with a variable muzzle velocity feature, was negligently designed, had a defect which rendered it unreasonably dangerous and that this unreasonably dangerous condition proximately caused Marzullo's injury. Plaintiffs also contend that the warnings Crosman Corporation ("Defendant") placed on the Crosman 2100's box, owner's manual, documents which accompanied the gun and the gun itself were inadequate.

Simply put, the variable muzzle velocity feature of the Crosman 2100 is not a design defect or a defective and unreason-

ably dangerous condition of the gun. Rather, it is a function of the product. Based on the undisputed facts, when Marzullo was tragically injured, the Crosman 2100 operated exactly as it was designed to operate and neither failed in its function or the manner in which it was designed to operate. That, in this particular case, the consequence of its use resulted in a tragic injury is not the result of a defect or unreasonably dangerous condition of the product but rather the careless use of the product by one over whom Defendant had no control. Defendant expressly warned on the Crosman 2100's box and in the documents accompanying it that misuse or careless use of the Crosman 2100 could cause *"serious injury or death"*. Moreover, the danger that misuse or careless use of the Crosman 2100 posed was open and obvious to any reasonable person.

### FACTUAL BACKGROUND

Defendant manufactures the Crosman 2100. The Crosman 2100 was initially packaged and sold in a box accompanied by an owner's manual and other instructional documents. Conspicuously printed on the box was the following:

> **CAUTION: NOT A TOY. ADULT SUPERVISION REQUIRED. MISUSE OR CARELESS USE MAY CAUSE SERIOUS INJURY OR DEATH. MAY BE DANGEROUS UP TO 475 YARDS (435 METRES).** (Dkt. 81, Ex. 20).

This message was repeated in the owner's manual. (Dkt. 81, Ex. 19). The owner's manual also provides explanatory information regarding the muzzle velocity of the Crosman 2100, which could be increased after the gun is pumped a certain number of times. (Dkt. 81, Ex. 19, p. 18). For example, if the Crosman 2100 is pumped three times, it has an average muzzle velocity of 475–525 feet per second, with a .177 BB. *Id.* If the Crosman 2100 is pumped six times, it has an average muzzle velocity of 630–680 feet per second, with a .177 BB. *Id.*

Also included in the box was **"A SPECIAL MESSAGE TO PARENTS"**, which stated in part:

> **This airgun is not a toy. Personal injury or death can result from improper handling if a pellet or BB strikes someone in a vulnerable spot.**
> 
> **Never point it at anyone for any reason.**
>
> \* \* \* \* \* \*
>
> **We recommend responsible adult supervision.**
>
> \* \* \* \* \* \*

(Dkt. 81, Ex. 18).

Additionally, on the side of the Crosman 2100 itself, above the trigger, the following is printed: **"Before using—read instructions available from Crosman Air Guns."** (Dkt. 80, p. 2).[1]

Scott Crawford purchased the subject Crosman 2100 from his nephew without the box or owner's manual. (Crawford Depo., pp. 9, 12). On April 4, 1999, Michael Cucci ("M.Cucci") borrowed the BB gun from Crawford. (Crawford Depo., p. 17). Later that day, M. Cucci, his brother, Christopher Cucci ("C.Cucci"), and C. Cucci's girlfriend, Lalainia Routh, were shooting the Crosman 2100 into trees and at a stop sign. (C.Cucci Depo., pp. 44–46, 92). C. Cucci prepared the BB gun so it could be fired with a pull of the trigger. C. Cucci then handed the gun to Routh. During an interview with a detective after the shooting, C. Cucci stated that he cocked the gun and pumped it approximately five to seven times before handing

---

1. Plaintiffs do not dispute Defendant's assertion regarding the message printed on the Crosman 2100.

the gun to Routh. (C. Cucci Depo., 85, 92, 96–97).

Routh had no experience handling or shooting BB guns. (Routh Depo., 8). However, in the past, she had been told by her father to never point a gun at anyone. (Routh Depo., 13). Routh testified that she "never thought of a BB gun as an actual weapon, more or less a toy." (Routh Depo., 14). She understood, however, from the movie The Christmas Story, that a BB gun could cause injury. (Routh Depo., 14–15). Routh testified that she knew that she should not point the gun at anyone because if she did, she could hurt them. (Routh Depo., 26). Routh understood that the gun was loaded and ready to fire when C. Cucci handed it to her. (Routh Depo., 27–28).

That evening, Marzullo was walking with two friends on the opposite side of the street from C. Cucci, M. Cucci and Routh. (L. Routh, 30–32, 37–38; B. Marzullo Depo., 8–9). Conflicting testimony exists regarding what was said between Marzullo, his two friends, Routh and the Cucci brothers. However, it is undisputed that Routh deliberately pulled the trigger and the Crosman 2100 fired. (Routh Depo., 46–48). As a result, Marzullo was hit in the head with a BB pellet and suffered serious injury. Routh testified that she "didn't want to hit him [Marzullo] because [she] didn't want to harm him in any way, whether it being a graze or what happened. It was just [her] intentions to scare him." (Routh Depo., 57–58).[2]

Marzullo and his parents (collectively "Plaintiffs") filed an Amended Complaint

against Defendant alleging negligence (Count I) and strict liability (Count II). (Dkt. 95). Plaintiffs claim design defect and failure to warn under strict products liability and negligence theories. Defendant moves for summary judgment on all claims.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56. The Court must view all evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir.1997). Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

## DISCUSSION

### I. COUNT I—NEGLIGENCE [3]

---

2. Detective Joseph Perry of the Manatee County Sheriff's Department conducted an investigation of the shooting. He concluded that "Routh knowingly and intentionally shot the air rifle while she knew it was pointed in the vicinity of the victim [B. Marzullo]." (Dkt. 81, Ex. 17, "Investigation Report," p.

15). Whether Routh intended to hit Marzullo is not material to the issues before the court.

3. In their negligent design and failure to warn claims, Plaintiffs have made reference to Defendant's distribution and marketing of the Crosman 2100. Specifically, Plaintiffs allege that "Defendant Crosman was negligent and

### A. Design Defect—Muzzle Velocity [4]

■ Plaintiffs allege that the Crosman 2100 was defectively designed because "the muzzle velocity of BBs or pellets shot [from the gun] could easily reach speeds into the 600s or 700s of feet per second, and even beyond, or speeds at which BBs can easily penetrate bones and vital organs." (Dkt. 95, ¶ 23). Plaintiffs contend this feature of the 2100 constitutes a negligent design.

■ In the context of products liability, the basic elements of a negligence cause of action apply: (1) duty of care toward the plaintiff; (2) breach of that duty (or negligence); (3) proximate cause. *See Stazenski v. Tennant Company*, 617 So.2d 344, 345–46 (Fla. 1st DCA 1993). The plaintiff also must establish that the product was defective or unreasonably dangerous. *See Siemens Energy & Automation v. Medina*, 719 So.2d 312, 315 (Fla. 3d DCA 1998) *rev. denied*, 733 So.2d 516 (Fla.1999).[5]

Defendant seeks summary judgment on Plaintiffs' design defect claim, arguing that the muzzle velocity of the Crosman 2100 is a function of the gun rather than a defect or unreasonably dangerous condition. The Court agrees. The airgun's muzzle velocity is not, as a matter of law, a design defect and is not a defective condition. *See Moss v. Crosman Corp.*, 136 F.3d 1169 (7th Cir.1998).

Plaintiffs argue that nothing in the record supports Defendant's contention. To the contrary, the record evidence establishes that adjusting the muzzle velocity of the Crosman 2100 changes the function or performance of the gun and is not a defect in its design or operation. James Jereckos, Crosman's former vice president of operations, testified that "air gun velocity of a particular gun is a feature of that gun . . ." (Jereckos Depo., p. 36). Jereckos testified that the muzzle velocity "provides a variable for the user depending on the condition in which they are going to use it." (Jereckos Depo., p. 65).

As in *Moss*, these Plaintiffs assert that the Crosman 2100 had far more firepower than the Plaintiffs or any other reasonable person would have expected.[6] Plaintiffs do

---

deviated from proper engineering practices in the design, manufacture, distribution, marketing and labeling of its product in that the product as released in the United States has a hidden velocity that exceeds appropriate safety parameters when used for the purpose for which it is intended." (Dkt. 95, ¶ 45). Plaintiffs do not argue that their negligence claim includes a claim for negligent marketing. The court cannot read into such broadly worded allegations claims or theory not argued by Plaintiffs in their response to Defendant's motion for summary judgment. *See Iraola & CIA, S.A. v. Kimberly–Clark Corp.*, 325 F.3d 1274, 1284 n. 6 (11th Cir.2003).

**4.** The only design defect claim before the Court is Plaintiffs' claim regarding the muzzle velocity of the Crosman 2100. Throughout the Amended Complaint, Plaintiffs allege that the Crosman 2100 is defective because it was designed with excessive muzzle velocity and because of Defendant's inadequate warnings. (Dkt. 95, ¶¶ 5–7, 19, 23, 43). Plaintiffs do not allege that the Crosman 2100 was defective

because it did not have an automatic safety. Plaintiffs' expert, however, Robert Townshend, in a report dated January 27, 2003, opined that the product is defective because it did not include an automatic safety. (Dkt. 81, Ex. 14). Significantly, Plaintiffs did not seek leave to add this claim when they filed their motion to amend the Complaint on January 30, 2003. (Dkt. 40). This new theory of design defect is not, therefore, properly before the Court and may not be raised for the first time in connection with a summary judgment motion. *See Iraola*, 325 F.3d at 1286; *Flanigan's Enterprises, Inc. v. Fulton County, Ga.*, 242 F.3d 976, 988 (11th Cir.2001).

**5.** Under a strict liability theory the elements are the same. The plaintiff does not, however, have the burden of proving specific acts of negligence. *Jennings v. BIC Corp.*, 181 F.3d 1250, 1256–57 (11th Cir.1999).

**6.** Plaintiffs' argument is analogous to arguing that a Boy Scout pocket knife is too sharp for

not allege that the Crosman 2100 failed to perform the function for which it was designed. Nor do they claim that an alternative design would have enabled the Crosman 2100 to fire BBs with the same amount of fire power in a safer manner.

■ The Court agrees with Defendant that, as a matter of law, the muzzle velocity of the Crosman 2100 is not a condition of the gun and, by definition, cannot be a defective or unreasonably dangerous condition. If there is no defect or unreasonably dangerous condition, there can be no products liability action on Plaintiffs' muzzle velocity claim.[7] Accordingly, Defendant's motion for summary judgment as to Count I (negligent design defect) is **GRANTED.**

### B. *Failure to Warn*

Plaintiffs also allege that the Crosman 2100 was defective because (1) the warnings included within the packaging materials and owner's manual were inadequate and (2) Defendant failed to include a warning about the gun's muzzle velocities and

ability to penetrate bone on the gun itself.[8] Defendant contends that it is entitled to summary judgment on Plaintiffs' failure to warn claims because the warnings that accompanied the Crosman 2100 were reasonable and adequate and because it had no duty to warn of obvious dangers, such as the danger posed by Routh's actions— pointing the gun in the vicinity of another individual and deliberately pulling the trigger. (Dkt. 80, p. 15).

### (1) Warnings Accompanying the Crosman 2100

■ "To warn adequately, the product label must make apparent the potential harmful consequences. The warning should be of such intensity as to cause a reasonable man to exercise for his own safety caution commensurate with the potential danger." *Am. Cyanamid Co. v. Roy*, 466 So.2d 1079, 1082 (Fla. 4th DCA 1984). In addition, "a warning should contain some wording directed to the significant dangers arising from failure to use the product in the prescribed manner, such as the risk of serious injury or death." *Id.*

---

its intended use or sharper than a reasonable scout would expect, or that a sports car is faster and more dangerous than a reasonable person would expect. These contentions would defy logic, given the inherent nature of these products. Performance features which can be controlled by the user are not necessarily design defects or unreasonably dangerous conditions. Knives can be sharpened and sports cars can be driven as fast as the driver desires. Similar to increasing the muzzle velocity of a BB gun, the user controls the performance of these products. However, the risk that careless use of these products can cause injury, even absent a performance enhancement, remains a risk inherent in the use of the product.

7. A product is not defective for performing in the manner that it was designed. *See Moss*, 136 F.3d at 1169; *see also Trespalacios v. Valor Corp.*, 486 So.2d 649, 650 (Fla. 3d DCA 1986) ("... one who is injured while using a perfectly made axe or knife would have no

right to a strict liability action against the manufacturer because the product that injured him was not defective").

8. Plaintiffs' claim concerning Defendant's alleged failure to warn is not a model of clarity. Within Count I, Plaintiffs allege that Defendant was "negligent in that it failed to adequately advise the public and warn users of its product of the latent, hidden, deadly nature and potential ..." (Dkt. 95, ¶ 43). This allegation is interpreted as a claim that none of the warnings provided, including those on the box and those in documents accompanying the box were adequate. In the general allegations incorporated by reference into Count I, Plaintiffs do allege that the Crosman 2100 is defective because it failed to "include any warning on the BB/pellet gun itself about its potential muzzle velocities, its range at which a BB or pellet could penetrate bone and other tissues, or any other matter concerning risks inherent in its use." (Dkt. 95, ¶ 28).

The Court agrees with Defendant that, as a matter of law, the warnings that accompanied the Crosman 2100 were clear, unambiguous, adequate and reasonable. The record establishes that the warnings contained on the box, in the packaging materials, and in the owner's manual expressly and adequately warn that the gun was "not a toy", "adult supervision [was] required", and "misuse or careless use may cause serious injury or death." (Dkt. 81, Exs. 18–20). The "Special Message to Parents" expressly instructed the user "[n]ever to point [the gun] at anyone for any reason." Additionally and significantly, the owner's manual provided explanatory information regarding the gun's variable muzzle velocity. (Dkt. 81, Ex. 19, p. 18).

When examined closely, it is apparent that Plaintiffs' arguments do not focus on the sufficiency of the warnings relative to the risk of *serious injury or death* from the misuse or careless use of the Crosman 2100. Given the express warnings on the box, in the owner's manual and in the other documents accompanying the Crosman 2100 when it left the manufacturer, Plaintiffs could not reasonably argue that the consuming public would not be warned of the potential for serious injury or even death from the careless use of the Crosman 2100. Apparently recognizing the adequacy of these warnings, Plaintiffs focus on the variable muzzle velocity and argue that this feature of the BB gun presents a risk of injury about which consumers have not been adequately warned. Plaintiffs' arguments are misplaced. Their arguments focus on the degree of injury rather than on the risk of serious injury attendant to careless use of the product.

Here, it is undisputed that the manufacturer expressly warned, in its packaging and owner's manual, that misuse or careless use of the Crosman 2100 could cause *serious injury or death* and that it could be dangerous "up to 475 yards." It is undisputed, for example, that even Routh knew a BB gun could cause injury such as putting an eye out. The "difference between the risk of being hit with a BB and it causing serious eye damage and the risk of being hit with a BB and it causing death is a difference of degree and not of kind." *Moss,* 945 F.Supp. at 1181–82. "The [appropriate] focus is on the risk, and not on the degree of injury." *Id.*

From the perspective of the adequacy of this manufacturer's warnings, it cannot be said that losing an eye is any less serious than a BB penetrating skin or bone. The warnings on the box warned of the risk of serious injury or even death. That the potential for serious injury may vary depending on the manner in which the BB gun was used, the distance involved, the place on one's body where a BB impacts or what muzzle velocity the user chooses does not detract from the adequacy of Defendant's express warning that *any* misuse or careless use of the BB gun could cause serious injury or death. It was reasonable for Defendant to warn that misuse or careless use of the Crosman 2100 in general could cause serious injury or death and it would not be reasonable to require Defendant to differentiate between functions of the Crosman 2100 in its warnings or the degree of injury which could result from the careless use of the BB gun.

The risk of serious injury is all encompassing, regardless of the operational features of the Crosman 2100. The degree of harm about which Plaintiffs complain is adequately covered in the warnings Defendant placed on its packaging and documents accompanying the Crosman 2100. Accordingly, Defendant is entitled to judgment as a matter of law on Plaintiffs' claim that the warnings accompanying the Crosman 2100 were inadequate.

## (2) Warning on the Crosman 2100

 Plaintiffs allege that Defendant failed to include a warning on the gun itself of "its potential muzzle velocities, its range at which a BB or pellet could penetrate bone and other tissues, or other matter concerning risks inherent in its use." (Dkt. 95, ¶ 28). Plaintiffs contend Defendant should have placed a warning on the gun itself because Defendant "knew the owner's manuals and other package information which originally accompanied its products often were lost or discarded, or otherwise did not go along with the BB guns it manufactured." (Dkt. 95, ¶ 29).

With regard to Plaintiffs' claim that the Crosman 2100 was defective because the warning on the gun itself was inadequate, Plaintiffs cite no authority supporting their contention that Defendant should have placed such a warning on the product itself, in addition to adequate warnings on and in the packaging accompanying the product when it left the manufacturer. Moreover, Plaintiffs do not take issue with the fact that Crosman printed on the Crosman 2100 a caution to the user to read the owner's manual before using the BB gun. As discussed, the owner's manual explained the variable muzzle velocity feature of the Crosman 2100. Plaintiff's contention that these warnings and explanations should be repeated on the gun itself would place an unreasonable burden on Defendant and would be tantamount to requiring Defendant to act as an insurer with regard to the use of its product. *See West*, 336 So.2d at 86 (a manufacturer or seller is not an insurer of its product even under strict products liability). It is not reasonable to require Defendant "to take all possible measures to ensure that its products could not be misused by anyone who might, even foreseeably, come into possession of them. Decisions of the Florida courts demonstrate that a maker or seller of a product need not go to extreme lengths to protect foreseeable users of its products." *Jennings v. BIC Corporation*, 181 F.3d 1250, 1257 (11th Cir.1999) (citations omitted).

 In any event, such a requirement would be unreasonable and unnecessary since the risk of serious injury or death from the misuse or careless use of any gun is an open and obvious danger to any reasonable person. Under Florida law, "[a] duty to warn arises where a product is inherently dangerous or has dangerous propensities ... However, there is no duty to warn of an obvious danger." *Scheman–Gonzalez v. Saber Manufacturing Company*, 816 So.2d 1133, 1139 (Fla. 4th DCA 2002) (citations omitted); *Siemens Energy & Automation, Inc.*, 719 So.2d 312, 314–15 (Fla. 3d DCA 1998) (citations omitted).[9] "The obviousness of danger and adequacy of warning are determined by a 'reasonable person'

---

9. Plaintiffs argue that the patent danger of a product is not an exception to liability, but rather a defense by which the manufacturer may show that a plaintiff did not exercise a reasonable degree of care. (Dkt. 84, p. 16). While this is true where a product is defective in design, under a pure failure to warn theory, the open and obvious doctrine can bar a claim. *See Babine v. Gilley's Bronco Shop, Inc.*, 488 So.2d 176, 178 (Fla. 1st DCA 1986); *see also Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1486–87 (11th Cir.1994). Here, Plaintiffs allege that Defendant was negligent in its design and failure to warn. However, for the reasons discussed *supra*, the Court finds as a matter of a law that the muzzle velocity feature of the Crosman 2100 was a function of the gun, not a defective or unreasonably dangerous condition. Accordingly, Plaintiffs' negligent failure to warn claim is subject to dismissal under the open and obvious doctrine. *See Siemens Energy & Automation, Inc. v. Medina*, 719 So.2d 312, 315 (Fla. 3d DCA 1998) (where jury found that defendant did not manufacture a defective product, negligent failure to warn claim failed under open and obvious danger doctrine).

standard, rather than on each particular plaintiff's subjective appreciation of the danger." *See Byrnes v. Honda Motor Co., Ltd.,* 887 F.Supp. 279, 281 (S.D.Fla.1994) (citing *Johns–Manville Sales Corp. v. Janssens,* 463 So.2d 242, 251 (Fla. 1st DCA 1984)). While in many cases, the obvious and common nature of a peril will be a question for the jury, it may be determined as a matter of law in "plain and palpable cases". *See e.g., Byrnes,* 887 F.Supp. at 281 (dangers posed to a motorcycle operator's lower extremities in the event of a collision are open and obvious as a matter of law); *Light v. Weldarc Co., Inc.,* 569 So.2d 1302, 1303 (Fla. 5th DCA 1990) (danger posed of safety glasses slipping causing particle to penetrate user's eye obvious as a matter of law).

A reasonable person knows or should know of the dangers presented by shooting at another individual with a BB gun. While not determinative under an objective standard, here, Crawford, Routh and C. Cucci testified that they understood that shooting the Crosman 2100 at another individual could cause injury. Routh testified that she had been instructed never to shoot a gun in the direction of another person for this reason.

The Court finds, as a matter of law, that the risk that an individual could suffer serious injury or death as a result of the misuse or careless use of a BB gun is apparent to the average consumer, including teenagers, and the dangers of such a

product are open and obvious. The record, including the testimony of Plaintiffs' experts, William Kitzes and David Townshend, supports the conclusion that the Crosman 2100 did not place users at risk of injury *different in kind* than those that an average consumer might anticipate. The fact that the Crosman 2100 caused, in this case, brain damage, rather than the loss of an eye or mere skin abrasion, does not transform the fundamental nature of the injury. The risk of serious injury was open and obvious as a matter of law. Accordingly, Defendant's motion for summary judgment on Count I (negligent failure to warn) is **GRANTED.**

## II. *STRICT LIABILITY*

### A. *Design Defect—Muzzle Velocity*

 To prove a claim for strict liability for defective design, a plaintiff must show that the defendant manufactured or distributed the product in question, that the product has a defect that renders it unreasonably dangerous and that the unreasonably dangerous condition is the proximate cause of the plaintiff's injury. *Jennings v. BIC Corporation,* 181 F.3d 1250, 1255 (11th Cir.1999); *West v. Caterpillar Tractor Co.,* 336 So.2d 80 (Fla.1976).[10]

 Plaintiffs acknowledge that under Florida law, they " . . . must demonstrate that the Crosman was defective when it left the possession of Crosman and . . . [that] . . . the defect was the legal

---

**10.** In *West,* the Florida Supreme Court adopted the doctrine of strict liability as stated by the American Law Institute Restatement (Second) of Torts, § 402A:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability or physical harm thereby caused to the ultimate user or consumer, or to his property if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
(2) The rule stated in Subsection (1) applies although
(a) the seller has exercised all possible care in the preparation and sale of his product, and
(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.
*West,* 336 So.2d at 84.

cause of loss, injury or damages sustained by the Plaintiffs." (Dkt. 84, p. 10). Indeed, in Florida, a plaintiff must prove a *defective and unreasonably dangerous condition* of a product was the proximate cause of injury. *West,* 336 So.2d at 87(emphasis added). The defectiveness of a design is judged from the perspective of an "ordinary consumer" or the "normal public expectation" and "not from the viewpoint of any specific user." *Jennings,* 181 F.3d at 1255.

As discussed in section IA *supra,* the variable muzzle velocity of the Crosman 2100 was a design feature and function of the gun and not a defective or unreasonably dangerous condition. Absent a defect or unreasonably dangerous condition there can be no strict products liability. *See Jennings,* 181 F.3d at 1255. Accordingly, Defendant's motion for summary judgment as to Count II (strict liability design defect) is **GRANTED**.

### B. *Failure to Warn*

Under the theory of strict products liability adopted in *West,* a product may be defective by virtue of an inadequate warning. *See Ferayorni v. Hyundai Motor Co.,* 711 So.2d 1167, 1170 (Fla. 4th DCA 1998). To establish strict liability failure to warn, a plaintiff must prove that the defendant is a manufacturer or distributor of the product at issue and that the defendant did not adequately warn of a particular risk that was known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of manufacture and distribution. *Id.* at 1172. The difference between negligent failure to warn and failure to warn under a strict liability theory is that "a prima facie case of strict liability failure to warn does not require a showing of negligence." *Id.* "At the same time, however, strict liability does not make the manufacturer or seller an insurer." *Id.* (citations omitted).

As discussed in section IB *supra,* the Court finds that the warnings that accompanied the Crosman 2100 were adequate as a matter of law. Likewise, because the risk of serious injury from misuse or careless use of the Crosman 2100 was open and obvious, Defendant did not have a duty to place a warning in this regard on the Crosman 2100 itself. Therefore, summary judgment on Plaintiffs' strict liability failure to warn claim is appropriate.

Accordingly, it is **ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment (Dkt.79) is **GRANTED**. The Clerk is directed to enter judgment in favor of Defendant, close this case, and deny all pending motions as moot.

### JUDGMENT IN A CIVIL CASE

**Decision by Court.** This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

### IT IS ORDERED AND ADJUDGED

that judgment is entered in favor of the defendant, Crosman Corporation.