**Dolores MOSS and Larry Moss, Plaintiffs–Appellants,**

v.

**CROSMAN CORP. and Kmart Corp., Defendants–Appellees.**

No. 96–3494.

United States Court of Appeals, Seventh Circuit.

Argued April 4, 1997.

Decided Feb. 23, 1998.

Frank E. Tolbert, Miller, Tolbert, Muehl-hausen, Muehlhausen & Groff, Logansport, IN, Edmond W. Foley (argued), South Bend, IN, Hugo A. Bamberth, LaPorte, IN, for Plaintiffs–Appellants.

Steven E. Danekas, Stephanie B. Miller, Wildman, Harrold, Allen & Dixon, Chicago, IL, Timothy J. Abeska (argued), Roemer & Mintz, South Bend, IN, for Defendants–Appellees.

Before CUMMINGS, DIANE P. WOOD, and EVANS, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Dangerous objects and children do not mix well, and when a child wields a particularly dangerous object like a gun, tragic consequences are predictable. Sadly, the predictable occurred when seven-year-old Joshua Moss and his cousin Tim Arnett were playing with a Crosman 760 Pumpmaster BB gun that Josh's father had just purchased for him. When it was Tim's turn to use the gun, Josh hid behind a tree that was about 15 feet in front of Tim. Just as Tim fired, Josh stuck

his head out from behind the tree and was struck in the eye with the BB. The BB pierced his eye, entered his brain, and Josh died almost instantly.

Josh's parents, Dolores and Larry Moss (both Indiana citizens) brought this products liability lawsuit in Indiana state court against Crosman Corp., the manufacturer of the gun, Coleman Company, a former owner of Crosman, and Kmart Corp., the seller of the gun. They alleged that the defendants caused Josh's death by selling an air gun with a dangerous velocity and by failing to provide adequate warnings detailing the dangers associated with the gun. Their complaint included demands for punitive damages and damages for emotional distress. Kmart (a Michigan corporation with its principal place of business in Michigan), Coleman (a Kansas corporation with its principal place of business in that state), and Crosman (a Delaware corporation with its principal place of business in New York), removed the case to federal court on the basis of diversity of citizenship. Coleman was dismissed from the action on August 8, 1995, by stipulation. After preliminary discovery, the district court (applying Indiana law) granted Crosman's and Kmart's motion for summary judgment. *Moss v. Crosman Corp.*, 945 F.Supp. 1167 (N.D.Ind.1996). We affirm.

## I

The central dispute on appeal is whether the BB gun was defective and unreasonably dangerous because of its design or because the warnings that accompanied it were inadequate for purposes of Indiana's products liability law, Ind.Code §§ 33–1–1.5–1 *et seq.* The Act offers two ways to prove that a product is defective. The first method focuses on the condition of the product itself:

[a] product is in a defective condition ... if, at the time it is conveyed by the seller to another party, it is in a condition:

(1) not contemplated by reasonable persons among those considered expected users or consumers of the product; and

(2) that will be unreasonably dangerous to the expected user or consumer when used in reasonably expectable ways of handling or consumption.

Ind.Code § 33–1–1.5–2.5(a). See *Anderson v. P.A. Radocy & Sons, Inc.*, 67 F.3d 619, 624–26 (7th Cir.1995); *Whitted v. General Motors Corp.*, 58 F.3d 1200, 1206 (7th Cir. 1995). The second method of proving defectiveness focuses on the warnings that accompany the product (if any):

[a] product is defective ... if the seller fails to:

(1) properly package or label the product to give reasonable warnings of danger about the product; or

(2) give reasonably complete instructions on proper use of the product;

when the seller, by exercising reasonable diligence, could have made such warnings or instructions available to the user or consumer.

Ind.Code § 33–1–1.5–2.5(b).

■ Summarizing the relevant Indiana law, this court held in *Whitted* that a plaintiff must prove the following four elements in a case under Indiana's product liability law: (1) the defective product was unreasonably dangerous; (2) the defect existed at the time the product left the defendant's control; (3) the product was expected to, and did, reach the consumer without substantial alteration; and (4) the plaintiff's injuries proximately resulted from the defect in the product. 58 F.3d at 1205. One could add a fifth element, which would be the need to prove that the product is "defective" as the term is defined in Indiana law. This can be done in three ways: by showing a manufacturing defect, a design defect, or a failure to warn. *Hoffman v. E.W. Bliss Co.*, 448 N.E.2d 277, 281 (Ind. 1983). Although the Indiana courts have discussed at some length whether it makes any sense to distinguish between a product that is defective because of inadequate warnings, and a product that is unreasonably dangerous because the warnings that accompany it are inadequate, we put that question to one side for now while we take a closer look at exactly what happened to Joshua Moss.

On September 18, 1993, Larry Moss, Sr., Josh's father, accompanied by his stepdaughter Shannon and his grandson Matthew, took Josh shopping at the Kmart in LaPorte,

Indiana. Larry and Dolores had recently been divorced, and Dolores was opposed to giving Josh an air gun. Nevertheless, when Josh, who had been pestering his father for a BB gun for some time, spotted the Crosman 760 Pumpmaster at the store, Larry relented and gave him the money to buy the gun. Larry admitted that he saw the warning on the box containing the gun that said "May cause death or injury," but that he had shrugged it off, thinking that it might just be referring to birds or small animals. The box also had the following warnings, none of which Larry read:

WARNING: NOT A TOY. ADULT SU-PERVISION REQUIRED. MISUSE OR CARELESS USE MAY CAUSE SERI-OUS INJURY OR DEATH. MAY BE DANGEROUS UP TO 475 YARDS (435 METERS). THIS AIR GUN IS IN-TENDED FOR USE BY THOSE 16 YEARS OF AGE OR OLDER. FOR COMPLETE OPERATING INSTRUC-TIONS, REVIEW OWNERS MANUAL INSIDE BOX BEFORE USING THIS AIR GUN.

Larry testified that he would have purchased the air gun even if the salesperson had directly told him that it could kill a human being.

When Larry and Josh returned home, they opened the box and Larry briefly instructed Josh on the use of the gun. He ignored the plastic bag with papers that fell out of the box, and thus did not see the following warning in the manual, which appeared in red print on page 2:

WARNING: NOT A TOY. ADULT SU-PERVISION REQUIRED. MISUSE OR CARELESS USE MAY CAUSE SERI-OUS INJURY OR DEATH. MAY BE DANGEROUS UP TO 475 YARDS (435 METERS). READ ALL INSTRUC-TIONS BEFORE USING.

There was also a separate flyer labeled "A SPECIAL MESSAGE TO PARENTS," which cautioned that "[p]ersonal injury or death can result from improper handling if a pellet or BB strikes someone in a vulnerable spot." At his deposition, Larry testified that he did not know if his decision to buy the gun and the way in which he allowed Josh to use

it would have been influenced if he had taken the time to look at these and other materials in the box.

Larry's instructions to Josh revealed, nevertheless, that he was well aware that the Pumpmaster could be dangerous if misused. He told Josh never to point the gun at any person or at dogs, not to shoot at the house, not to shoot at the plow because the BBs might ricochet back at him, not to shoot at neighbors' houses, and never to shoot it at anyone because it could put out an eye and because guns kill people. He also told Josh not to use the air gun without permission, not to use it unless Larry himself or Josh's 14-year-old brother Larry Lee was present. Finally, Larry told Josh not to use the air gun in the front yard, because it was too easy for an accident to happen there, with other children riding up and down the street.

For the next two weeks, Larry and Josh used the gun from time to time. The force with which the BBs were propelled was a function of how many times the gun was pumped before shooting. Larry could pump it as many as 20 times, but Josh could pump it only four or five times. On September 28, 1993, Josh wanted to use the gun, and Larry got it out for him. While he was playing with it, his 11-year-old cousin Tim Arnett came over. Tim had used Pumpmaster 760s before and was aware of rules similar to those Larry had given to Josh. On one occasion, while Tim was playing a BB war game with some friends, one boy was hit with BBs that broke through the blue jeans he was wearing and caused bleeding, when the air gun had been pumped only 2–3 times and had been fired from a distance of 40–50 steps. Another friend of Tim had been struck in the face with a BB that lodged in his cheek and caused bleeding.

The two boys played for some time on the 28th, chasing each other around the house. They then went to the side of the house near the street to practice shooting cans placed in a tree. When it was Tim's turn to shoot, Josh hid behind a tree located 15 feet in front of where Tim was standing. Tim pumped the gun three or four times and fired. At that instant, Josh poked his head out from behind the tree, was struck, and

died almost immediately despite Tim's efforts to alert others of the emergency and to summon help. Tim later testified that he knew the air gun could put Josh's eye out with two or three pumps at that distance, but that he did not think Josh would poke his head out.

The Mosses presented two theories of liability before the district court: first, they argued that the Pumpmaster was defective in design, both because its muzzle velocity was too high and because its design enhanced the injuries that a person otherwise might receive from the gun; and second, they claimed that the air gun was defective because the warnings that came with it were inadequate. The district court rejected both. It found that the muzzle velocity was a feature of the gun itself, not part of its design. Restricting its velocity would change its performance and functioning. Furthermore, Josh and Larry had the option of buying a different brand or model of air gun that had a lower muzzle velocity, but they chose not to. Following the district court's decision in *Anderson v. P.A. Radocy & Sons*, 865 F.Supp. 522 (N.D.Ind.1994), *aff'd*, 67 F.3d 619 (7th Cir. 1995), the court held that their voluntary decision to choose the air gun with a higher velocity relieved the defendants of any liability they might have for the alleged design defect. With respect to the enhanced injury claim, the court found that Indiana recognizes this theory of liability only in the motor vehicle context and that it would be inappropriate for a federal court sitting in diversity to extend it beyond its existing limits. On the failure to warn claim, the court expressly stated that it did not need to "address whether the BB gun's warnings avert liability for the defendants in this case, because the court finds that the BB gun was not unreasonably dangerous as a matter of law." 945 F.Supp. at 1181. The air gun injured Josh in a way that was known both to him and the general community of users, albeit to an extent greater than Josh, Larry, Dolores, and perhaps the community at large had anticipated. Just as in Anderson, however, given the known dangers, the court found that the difference was one of degree, not of kind. It therefore ruled for the defendants and dismissed the Mosses' case.

II

We return now to the elements of an action under Indiana's product liability law that *Whitted* described, to see if, taking the facts in the light most favorable to the Mosses, the district court was correct to grant summary judgment for the defendants. Only the first point (whether the defective product was unreasonably dangerous) and the fourth one (whether Josh's injuries proximately resulted from the defect in the product) are contested here. We therefore do not consider whether the defect existed at the time the product left the defendant's control or if the product was expected to, and did, reach the consumer without substantial alteration.

### 1. Design Defect

As the district court did, we consider first whether the Mosses were entitled to go to trial on their design defect theory. Although they apparently gave this theory equal weight with the failure to warn theory before the district court, they have not done so on appeal. Although we find the arguments on defective design to be cursory at best, we consider this separately for the sake of completeness. In essence, the defective design argument boils down to an assertion that the Pumpmaster had far more firepower than the Mosses or any other reasonable person would have expected. As the district court recognized, however, this is not a claim that the air gun was failing to perform the functions for which it had been designed, nor is it a claim that some alternative design would have made a gun with the same firepower more safe. It is a complaint about the Mosses' lack of knowledge concerning this gun, and their failure to appreciate what kind of weapon they had purchased for their young son. In short, the "design" point relates only to the failure to warn theory in the end: had they known how far, how fast, and with what penetrating power the pellets shot from the Pumpmaster would go, perhaps they would have made a different decision. This leaves us with no independent design defect argument relating specifically to the gun's velocity. We also agree with the dis-

trict court that Indiana has not recognized the enhanced injuries theory in cases of this kind, which means that we as a federal court sitting in diversity may not do so either.

### 2. *Failure To Warn*

We turn then to the Mosses' principal argument: that neither Crosman nor Kmart gave adequate warnings of the dangers associated with the 760 Pumpmaster. We assume initially, for the sake of argument only, that the Mosses presented enough evidence to survive summary judgment on the question whether the warnings were adequate. Their witnesses, whose testimony is rehearsed in the district court's published opinion, opined that stronger warnings should have appeared on the gun itself, not on miscellaneous pieces of paper found inside the box that were likely to be ignored or misplaced, or not to be handy when users of the gun were operating it. Inadequate warnings, under *Hoffman,* 448 N.E.2d at 281, and *Schooley v. Ingersoll Rand, Inc.,* 631 N.E.2d 932, 940 (Ind.Ct.App.1994), would be enough to show that the Pumpmaster was "defective" under § 33–1–1.5–2.5(b).

The key question is whether the Mosses are entitled to reach the jury on a showing that the air gun was defective because of inadequate warnings alone, or if, on the other hand, there is an independent requirement under the law to show that the product is unreasonably dangerous. If the former is true, then the district court erred in refusing to consider the question of the adequacy of the warnings, and we too would be required to undertake a full analysis of this question. If the latter is true, then the only question is whether the district court correctly concluded that the 760 Pumpmaster was, as a matter of law, not unreasonably dangerous.

■ Although the matter is not as clear as we might prefer, in our view Indiana continues to require a showing of unreasonable danger as one element of the plaintiff's case. This is consistent with the understanding of the law we expressed in *Whitted,* which indicated that the first question is whether a defective product (which we are assuming now we have) was unreasonably dangerous. We recognize that the Indiana courts have at times spoken as if the "defectiveness" inquiry and the "unreasonable danger" inquiry collapse into one in a failure to warn case. In *Jarrell v. Monsanto Co.,* 528 N.E.2d 1158 (Ind.Ct.App.1988), the Indiana Court of Appeals commented that "it adds nothing to require that a product unreasonably dangerous by reason of inadequate warnings also be in a 'defective condition.' The lack of adequate warning makes a dangerous product unreasonably dangerous. Liability attaches without proof of some additional 'defective condition.'" 528 N.E.2d at 1166 (emphasis omitted). Nevertheless, the Indiana Supreme Court, in a decision rendered two years after *Jarrell,* appeared to preserve a distinction between the two concepts:

> The concepts "defective condition" and "unreasonably dangerous" focus the relevant inquiry upon the product and its manufacturer or seller, as assessed by an objective standard, regarding expected use. Thus, in determining whether a product was sold in a defective condition unreasonably dangerous to a user, considerations must necessarily include the reasonably anticipated knowledge, perception, appreciation, circumstances, and behavior of expected users.

*Koske v. Townsend Engineering Co.,* 551 N.E.2d 437, 440–41 (Ind.1990). After *Koske,* the First District of the Court of Appeals reconciled the two approaches as follows, citing *Jarrell:*

> The requirement that the product be in a defective condition focuses on the product itself; whereas, the requirement that the product be unreasonably dangerous focuses on the reasonable contemplations and expectations of the consumer.... In order for liability to attach under I.C. § 33–1–1.5–3(a), both elements must be present.

*Cox v. American Aggregates Corp.,* 580 N.E.2d 679, 685 (Ind.Ct.App.1991).

■ Indiana Code § 33–1–1.5–2(7) defines the term "unreasonably dangerous" to refer to "any situation in which the use of a product exposes the consumer to a risk of physical harm to an extent beyond that contemplated by the ordinary consumer who purchases it with the ordinary knowledge

about the product's characteristics common to the community of consumers." The law thus creates an objective standard, under which the court must take into account "the reasonably anticipated knowledge, perception, appreciation, circumstances, and behavior of expected users." *Koske,* 551 N.E.2d at 440. The district court thought that the 760 Pumpmaster could not be regarded as unreasonably dangerous because the average person "is aware of the danger that a projectile fired from [a BB gun] could hit a person and cause serious injury." *Moss,* 945 F.Supp. at 1182. The Mosses respond that, even if the average person knew that BB guns could cause flesh wounds, loss of eyes, etc., the same person was specifically unaware that a BB gun would be as powerful as the Pumpmaster and thus could cause death.

In our view, the summary judgment record compels the conclusion that the 760 Pumpmaster did not place users at risk of injuries different in kind from those that an average consumer might anticipate. In *Anderson,* 67 F.3d at 625–26, we held that a metal crane was not unreasonably dangerous because the plaintiff was killed by electrocution instead of simply receiving an anticipated electrical shock. The same analysis applies here: the fact that the gun caused death rather than serious injury (*i.e.,* the loss of an eye or a flesh wound) to Josh does not transform the fundamental nature of the injury. The Mosses attempt to rely on Dolores Moss's testimony to the effect that she did not realize that BB guns were capable of penetrating the eye, and on Detective Dennis Francis's testimony reporting that his experience in the community indicated that people thought BB guns could only break the immediate surface of the skin. Neither of these is enough to create a genuine issue of fact under the objective test that Indiana uses for unreasonable dangerousness. Detective Francis's testimony, looked at the other way, indicates that people in the community did realize that a BB gun could cause flesh wounds, and a flesh wound in the wrong part of the body (*e.g.,* the temple or the eye) can be serious or fatal. Dolores Moss's testimony standing alone is simply not enough to create a genuine fact issue under an objective test. Even if she personally did not know

that a BB shot from the gun could penetrate the eye, she added that she knew it "could damage the eye," thereby conceding that she too knew that physical injury was possible. Other evidence, including the warnings on the box that even Larry saw, Larry's own advice to his son, Tim's testimony about the safety precautions he had been told to follow, and the expert testimony, overwhelmingly supports the proposition that the average person in the community knew the general kind of physical risk posed by a BB gun. *See also Rogers v. R.J. Reynolds Tobacco Co.,* 557 N.E.2d 1045, 1053 (Ind.Ct.App.1990). We therefore agree with the district court that the Mosses cannot prove one essential element of their case—that of unreasonable dangerousness—and that in turn makes summary judgment for the defendants appropriate. *See Welch v. Scripto–Tokai Corp.,* 651 N.E.2d 810, 815 (Ind.Ct.App.1995).

Although this is enough for an affirmance of the judgment, we hold in the alternative that the defendants would be able to establish the affirmative defense of incurred risk as a matter of law. See Ind.Code § 33–1–1.5–4(b)(1); *Clark v. Wiegand,* 617 N.E.2d 916, 918 (Ind.1993) (discussing the defense); *Schooley,* 631 N.E.2d at 939–40. The statute provides as follows:

> With respect to any action brought under this chapter:
>
> (1) It is a defense that the user or consumer bringing the action knew of the defect and was aware of the danger in the product and nevertheless proceeded to make use of the product and was injured.

Ind.Code § 33–1–1.5–4(b). The Indiana Supreme Court adds that "[i]t is not enough that a plaintiff have merely a general awareness of a potential for mishap, but rather, the defense of incurred risk demands a subjective analysis focusing upon the plaintiff's actual knowledge and appreciation of the specific risk and voluntary acceptance of that risk." *Clark,* 617 N.E.2d at 918. Under the statute, § 33–1–1.5–2(1), a "user or consumer" is defined broadly to include "a purchaser, any individual who uses or consumes the product, or any other person who, while act-

ing for or on behalf of the injured party, was in possession and control of the product in question, or any bystander injured by the product who would reasonably be expected to be in the vicinity of the product during its reasonably expected use."

Josh was certainly a "user or consumer" under this definition, because he purchased the gun and operated it, even if not at the final moment. But this is an action under the Child Wrongful Death Act, Ind.Code § 34–1–1–8, brought by Josh's parents Larry and Dolores Moss. That statute permits a parent or guardian to bring an action against a person whose wrongful act or omission causes the injury or death of a child, and specifies the items of damages that are recoverable. (They also sued to recover for their emotional distress, but they do not challenge the district court's conclusion that their right to recover under that count is dependent on the fate of their principal claim.) Even though Larry is the plaintiff, he stands in Josh's place in certain respects. For example, in construing a predecessor statute to § 34–1–1–8, this court held that while a child of three years could not be guilty of contributory negligence, the contributory negligence of one parent could bar the other parent's suit to recover for loss of services and similar injuries. *See Gillam v. J.C. Penney Co.*, 341 F.2d 457, 461–63 (7th Cir.1965). In a case dealing with an older child, the Supreme Court of Indiana held that "the contributory negligence of the minor child herein is imputable to the parent in the latter's action for loss of services of such child growing out of the alleged negligence of another." *Brown v. Slentz*, 237 Ind. 497, 147 N.E.2d 239, 240 (1958). Taking *Brown* and *Gillam* together, it seems plain that Indiana would also prevent a parent from recovering if his or her own negligence caused the child's injury or death. *Cf. Sheridan v. Siuda*, 150 Ind.App. 395, 276 N.E.2d 883, 890 (1971) (citing *Gillam* as support for the holding that "where a child sustains injury as a result of the concurrent negligence of a third person and one in whose charge he has been placed by a parent, the negligence of the custodian may be imputed to the parent"); *id.* (quoting 67 C.J.S. Parent and Child § 46) ("Contributory negligence on the part of the parent ordinari-

ly will preclude a recovery by him for an injury to the child."). And finally, the statutory affirmative defense of incurred risk is similar enough to the former defense of contributory negligence that we think Indiana courts would apply the same principles to the incurred risk defense as they did for contributory negligence under the predecessor statutes.

The evidence is overwhelming that Larry Moss was fully aware that the 760 Pumpmaster could pierce the eye and flesh. He saw the warning about death and assumed that it meant the gun could kill birds and small animals. Larry's warnings to Josh speak eloquently about his knowledge of the risks the gun posed. Larry incurred the risk of the type of injury Josh suffered when he bought the gun. Furthermore, under the logic of *Gillam*, even if Dolores (as she insists) was unaware of the full extent of the dangerousness of the gun, Larry's act in incurring the risk bars her right to recover under the Child Wrongful Death Act as well.

Sad though the fate of Joshua Moss was, the district court correctly ruled that neither Crosman nor Kmart was liable under the law to his parents for his wrongful death. We therefore AFFIRM the judgment of the district court.