**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 30, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

DILLON ANDREW YEAMAN;
MICHAEL YEAMAN; CATHY
YEAMAN,

      Plaintiffs - Appellants,

v.

HILLERICH & BRADSBY CO., d/b/a
Louisville Slugger,

      Defendant - Appellee.

No. 12-6254
(D.C. No. 5:10-CV-01097-F)
(W.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **HARTZ**, **O'BRIEN**, and **TYMKOVICH**, Circuit Judges.


Should a manufacturer be required to pay damages because a product performs its

intended function too well? High school pitcher Dillon Yeaman was seriously injured

when he was struck in the face by a baseball hit from a bat designed, manufactured, and

---

[*] This order and judgment is an unpublished decision, not binding precedent. 10th
Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1.
It is appropriate as it relates to law of the case, issue preclusion and claim preclusion.
Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A).
Citation to an order and judgment must be accompanied by an appropriate parenthetical
notation – (unpublished). *Id*.

sold by Hillerich & Bradsby (H&B), d/b/a Louisville Slugger. Claiming the bat was defective because it propelled the ball too fast, he and his parents brought a products liability action against H&B based on defective design and failure to warn. A jury awarded them damages of $951,095.85. Notwithstanding the jury's verdict, the district judge granted H&B's motion for judgment as a matter of law. He concluded, *inter alia*, the Yeamans had failed to present sufficient evidence for a reasonable jury to find (1) a defect in the bat making it unreasonably dangerous (defective design claim) or (2) a dangerous characteristic of the bat triggering a duty to warn (duty to warn claim). Because the Yeamans failed to present any objective evidence showing the bat to be dangerous beyond that reasonably to be contemplated by the ordinary consumer, we affirm.

## I. BACKGROUND

A.    The Incident

Dillon Yeaman was, and apparently still is, an extraordinarily gifted baseball player. On June 28, 2006, Norman High School and Westmoore High School squared off in a Pure Prairie League baseball game.[1] It was a night game and the home team, Norman, was losing. Dillon, then fifteen-years-old, was called upon to pitch for Norman. The batter, seventeen-year-old Chad Hyde, stepped to the plate. Hyde was over six feet

---

[1] The Pure Prairie League is a summer baseball league in Oklahoma. It is basically an extension of the high school baseball season but includes incoming freshman and excludes graduated seniors.

tall and weighed 220 to 225 pounds. He was the "clean-up" man—the fourth batter in the batting line-up—a spot reserved for better hitters. (Appellants' App'x, Vol. VIII at 2045.) It was late in the game, the bases were loaded or near loaded, and the pitch count was a full count (three balls, two strikes). The catcher called for a fastball. Dillon delivered.[2] Hyde hit a line drive headed straight at Dillon. The ball hit Dillon in the face, fracturing his frontal bones, frontal sinuses, nasal bones, and the orbital walls of both eyes. Dillon underwent surgery. Doctors inserted a mesh plate in his forehead and two splints under his nose and rebuilt the bridge of his nose with titanium. Dillon lost his sense of smell and his sense of taste was permanently altered.[3]

B.     The Bat

The line drive came from a 33-inch, 30-ounce Louisville Slugger Exogrid bat, Model No. CB71X, first manufactured in 2005. It was designed with a stiff handle and flexible barrel for "maximum trampoline effect" or "rebound." (Appellants' App'x, Vol. VII at 1813; Vol. XI at 2704.) Its advertisement speaks for itself:

> The Exogrid concept is simple: Increase handle stiffness and strength
> without increasing weight.

---

[2] The speed of Dillon's pitch is not known. Hyde estimated the pitch speed was in the upper 70's to lower 80's (mph). Dillon's coach estimated Dillon's pitching speed in 2006 was between 80 and 85 mph.

[3] Fortunately, Dillon returned to playing baseball but during the remainder of his high school baseball career, he always wore a protective mask when he was on the field. At the time of trial, he was playing for the University of Oklahoma. Because he is a .400 hitter and college pitchers do not bat, Dillon plays in the outfield.

To achieve this, we start with a one-piece bat, then metal is trimmed from the handle in a grid pattern to reduce overall handle weight. The metal is replaced with carbon inserts that are several times stiffer and lighter than the metal it replaces. For optimum stiffness, we then insert a carbon sleeve with unidirectional fibers that run the length of the handle. Finally, using a combination of heat and extreme pressure, the inserts, sleeve and metal wall are bonded together to work as a single, solid unit. This results in stiffness and strength never possible with aluminum alone.

Optimum performance comes from a stiff handle combined with a flexible barrel for maximum trampoline effect. And it doesn't get any stiffer than the Exogrid.[4]

(Appellants' App'x, Vol. XI at 2704.)

C.      Bat Performance Standards

At the time of Dillon's injuries, the Pure Prairie League required all non-wood bats used in the league to be BESR-certified. BESR stands for "Ball Exit Speed Ratio." (Appellants' App'x, Vol. X at 2465.) In order to obtain BESR certification, a bat manufacturer must present a prototype bat to a laboratory for testing and the bat must not exceed the BESR limit. At the time the Exogrid was manufactured, the BESR limit

---

[4] The collision between a baseball and a bat is a study of kinetic energy, the energy of moving objects. When a baseball is struck by an aluminum bat, the aluminum deforms inward toward the center of the bat. The kinetic energy from the collision is stored temporarily in the bat. Due to the elasticity of metals, the bat returns to its normal shape. When it does so, the stored kinetic energy is transferred to the ball, propelling it forward. This is referred to as the "trampoline effect."
George Manning, an engineer at H&B from 1979 to 2000, explained the "trampoline effect" as follows:

I think everyone is familiar with the trampoline children jump on, and basically it gives as you apply load to it, and then it gives back that energy in order to propel you off of it. The trampoline effect on a hollow bat is where the barrel gives under the impact of the ball, and then springs back, and helps propel the ball away from the bat.

(Appellants' App'x, Vol. X at 2464.)

- 4 -

corresponded to a maximum ball exit speed of 97 mph under laboratory conditions. This limit was set by the National Collegiate Athletic Association (NCAA) and was based on the best-performing wood bats. The trial evidence was conflicting as to whether the Exogrid was BESR-certified.[5]

At the time of trial, the BESR standard was obsolete; the NCAA replaced it with the BBCOR (Ball-Bat Coefficient of Restitution) standard. According to George Manning, a former H&B engineer, the trampoline effect is "essentially null" with BBCOR-certified bats because spacers are placed in the barrel of the bat to prevent the phenomenon from occurring.[6] (Appellants' App'x, Vol. X at 2465.)

D.     Pitcher Vulnerability to Batted Balls

A pitcher, more than any other player on the field, is particularly vulnerable to being hit by a batted ball. Besides the catcher, he is the closest offensive player to home plate. But unlike the catcher (who wears protective gear) and the other offensive players on the field, the pitcher must deliver the pitch before he can move into a defensive stance. Thus, pitchers are taught to have "their glove up" and be square to the plate upon

---

[5] As the district judge instructed the jury, whether the bat was BESR-certified matters not in determining whether it is defective and unreasonably dangerous under Oklahoma law. But, the BESR standard is significant for another reason: the existence of bat performance standards demonstrates the ability to measure bat performance—testing which was not done in this case.

[6] The district judge told the jury "this case is certainly not about whether the bat involved in this case should have been certified to a BBCOR standard, because it didn't even exist at that time." (Appellants' App'x, Vol. VII at 1633.) Again, we mention the BBCOR standard simply as an example of yet another way to measure a bat's performance.

completing their follow-through and to "[n]ever take your eye off the ball." (Appellants' App'x, Vol. VII at 1569, 1588.) Dillon admitted to knowing the unique danger pitchers face, but he claimed not to know a ball could be hit so fast he would have no time to defend himself.

E.      Daubert Motion

The Yeamans retained Dr. James Kent, a kinesiologist, to opine on the speed of the ball when it impacted Dillon's face, the amount of time Dillon had to react to the batted ball, the amount of time an ordinary fifteen-year-old pitcher needs to react to a batted ball, and the cause of Dillon's injuries. As to causation, he opined: "It is more probable than not [Dillon's] injuries were the direct result of the use of a baseball bat which possessed mechanical properties allowing a batted ball to [] attain a flight velocity in excess of a velocity that would otherwise allow for a reasonable time span by a pitcher of his age and developmental level in a follow-through position to safely respond to the oncoming batted ball." (Appellants' App'x, Vol. II at 331-32.) H&B filed a motion to exclude this opinion (as well as his others) under *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579 (1993).

At the *Daubert* hearing, Kent admitted factors other than the physical properties of the bat factor into the ball exit speed; these factors include the speed of the bat and the speed of the pitched ball. Because he did not know Hyde's swing speed or the speed of Dillon's pitch, Kent conceded his causation opinion was unsound: "[My causation opinion] probably would have been better written comparing [the Exogrid] to a wood bat . . . . [T]hat's really the intent there is, its comparison between wood and engineered

bats." (Appellants' App'x, Vol. VI at 1345.) Thus, the district judge granted the *Daubert* motion as to this opinion. As we will discuss, Kent's admission is telling.

F.    The Trial

The judge denied H&B's motion for summary judgment. Accordingly, the case went to trial before a jury.

The Yeamans' theme throughout trial was that the Exogrid hit the ball "too fast," was "too hot of a bat" and had "enhanced performance." (Appellants' App'x, Vol. VII at 1525; Vol. IX at 2334.) To support this theory, they called several eye-witnesses to the incident. They generally reported Dillon to be an excellent defensive player with sound pitching mechanics who had insufficient time to react to the ball coming from Hyde's line drive simply because it was traveling too fast.[7] Dillon himself said "[he] had no chance." (Appellants' App'x, Vol. VII at 1753.) He explained "[the ball] went from a pea to a beach ball in almost (snap fingers) like that." (Appellants' App'x, Vol. VII at 1752.)

Several lay witnesses also testified to the "huge difference" between wood bats and aluminum bats, in particular, BESR-certified bats. (Appellants' App'x, Vol. VII at 1608.) They said they can hit the ball harder and farther with a BESR-certified bat. They also said BESR-certified bats have more "pop" and are more "forgiving" than wood—"if you mishit [a ball with a BESR-certified bat], it's still got [a] better opportunity to go into

---

[7] When not pitching, Dillon mostly played third base, which one witness described as the "hot box"—the position "for the guys with the best reaction." (R. Vol. VII at 1619.)

play"; "[i]f you mishit a ball with a wood bat, it's not going to go anywhere." (Appellants' App'x, Vol. VII at 1597, 1609.) Some of these witnesses also testified that BBCOR-certified bats performed like wood bats and the ball can be hit farther with a BESR-certified bat than a BBCOR-certified one.

The Yeamans also called two experts—William Coleman, a metallurgist, and Kent. Coleman cut open an exemplar Exogrid bat, measured the wall thickness, and performed hardness testing and chemical analysis of the materials making up the bat. He told the jury the bat was constructed to optimize handle strength and stiffness. Thus, when the bat impacts with the ball, increased deflection occurs at the barrel instead of the handle. This design, he explained, maximizes the trampoline effect or energy transfer to the ball at impact, increasing the ball's exit speed and reducing the time a player in the field has to react to the ball. Importantly, Coleman did not test the performance of the Exogrid, determine the exit speed of balls off the Exogrid, or compare its performance with that of wood bats or other metal bats. He admitted such tests could have been done but "that was not my role." (Appellants' App'x, Vol. VII at 1824.)

Kent examined the medical imaging of Dillon's injuries and concluded the force necessary to cause those injuries (the force-to-fracture) was, conservatively speaking, 2,684 pounds.[8] Plugging this number into a simple physics formula, he determined the

---

[8] Kent primarily relied on a study where a 48-millimeter spherical steel anvil was dropped vertically down on the skulls of twelve unembalmed intact human cadaver heads (ages 50 to 76 years-old) at 16 to 18 mph and the force necessary to fracture the skulls was recorded. The mean force necessary to do so in the dynamic load tests was 2,684

(Continued . . . )

speed of the ball at impact with Dillon's face was 100 to 105 mph.[9]  Thus, he concluded

the ball must have left the bat at least at this speed.  He then figured the distance the ball

must have traveled to hit Dillon was 52 to 55 feet.[10]  Again, plugging both the speed and

the distance into a simple formula,[11] he determined the time Dillon had to react to the ball

was 336 to 374 milliseconds.  Looking to the scientific literature, he said a typical fifteen-

year-old pitcher needs, at a minimum, 380 to 400 milliseconds to react.[12]  Dillon's

reaction time fell short by at most 64 milliseconds.

---

pounds.  According to H&B, Kent improperly relied on this study to support his force-to-fracture estimate because it does not adequately imitate a person being hit horizontally by a lighter and smaller baseball at a high speed and the anvil did not strike the cadaver skulls in the same location where Dillon was struck by the baseball.  As we will explain, the issue is whether the Yeamans presented sufficient evidence of the ball exit speed expected from a bat by the ordinary bat consumer and whether the ball exit speed produced by the Exogrid exceeded those expectations.  Even accepting Kent's opinions, the answer is no.  Thus, we need not decide whether Kent's opinions should have been stricken under *Daubert*.

[9] $fd=\frac{1}{2}mv^2$.  The force (f) was 2,684 pounds.  Considering the depths of Dillon's fractures as well as the deformation of the ball and Dillon's soft tissue, Kent determined the total distance (d) over which the velocity (v) of the ball was acting was .03904 to .0433 feet.  The mass (m) of the baseball was .00097 slugs.  Plugging these numbers into the equation led to a velocity of 146.98 to 154.8 feet per second or 100.2 to 105.52 mph.

[10] The standard distance between home plate and the pitching rubber is sixty feet, six inches.  Kent figured a pitching follow-through of five to eight feet.  In other words, he estimated Dillon was five to eight feet closer to home plate after pitching the ball.  Dillon testified his pitching stride is approximately six feet.

[11] Time (t) equals distance (d) divided by velocity (v).

[12] H&B countered Kent's opinion with the testimony of its own expert, Dr. Doug Young, also a kinesiologist.  Young opined "a player or pitcher who has the general age, skill and experience of [Dillon] would reasonably be expected to avoid a ball hit back at him at about 105 miles an hour or so" and thus Dillon could have avoided the ball hit by Hyde.  (Appellants' App'x, Vol. IX at 2240.)  He based his opinion on a study he

(Continued . . . )

- 9 -

Notably, Kent did not present himself as a bat expert. And he did not consider or rule out other potential causes for the accident such as pitcher fatigue or inattention. Consistent with the judge's *Daubert* ruling, he did not offer an opinion as to whether the performance of the bat or a failure to warn of the bat's capabilities were the cause of Dillon's injuries.

G.      Motion for Judgment as a Matter of Law

The jury found for the Yeamans on both the defective design and failure to warn claims, awarding $871,000 to Dillon and $80,095.85 (the amount of Dillon's medical expenses) to his parents.[13] The victory was short-lived.[14] The district judge granted H&B's motion for judgment as a matter of law. As to the defective design claim, he started with the Yeamans' theory—the Exogrid is defective and unreasonably dangerous because it hits the ball too fast, not allowing an ordinary fifteen-year-old sufficient time to react. Thus, he reasoned, an "acceptable" bat, i.e., a non-defective bat, is one which allows balls to be hit only at speeds which an ordinary fifteen-year-old has time to react

conducted in 2001 for H&B in which he attempted to analyze pitcher reaction time. The study involved high school and collegiate pitchers. The participants pitched the ball and if the ball hit the strike zone a pitching machine or air cannon would fire a ball back at the participant. The maximum speed of the ball fired at the participants was 111 mph for the high school participants and 129 mph for the collegiate participants. Not one participant was hit with the ball; all were able to track it. But his study was not perfect— the participants wore protective gear, there was a slight delay between the pitch hitting the strike zone and the ball being fired back at them, and there was an element of anticipation—all participants knew a ball would be fired back at them.

[13] The jury rejected H&B's assumption of the risk defense and the Yeamans' demand for punitive damages. Neither of these issues is before us.

[14] "It ain't over till it's over." Yogi Berra

to.  Therefore, he concluded the Exogrid must be judged on a relative scale, not an absolute one.  Using this standard, he found the Yeamans' evidence missed the mark—there was no evidence upon which a jury could rationally find the performance of the Exogrid bat exceeded the performance of an acceptable bat.  "Where the difference between an acceptable bat and an actionable bat is on the order of 64 milliseconds (64 thousandths of one second), the subjectively perceived performance of the Exogrid bat as seen at the ballpark one night simply cannot provide a rational basis for a finding that the performance of the Exogrid bat, as wielded by Chad Hyde, made it defective and unreasonably dangerous versus the performance of an acceptable bat."  (Appellants' App'x, Vol. V at 1282.)  Rather, the judge said the Yeamans were required to show how fast the Exogrid could make a ball fly as compared to an "acceptable bat"—testing which could have been done but was not.  (Appellants' App'x, Vol. V at 1282.)

For the same reasons, the judge set aside the jury's verdict on the failure to warn claim.  On a relative scale, the Yeamans' evidence failed to show the Exogrid has a dangerous characteristic—propels the ball too fast—triggering a duty to warn.[15]

## II. DISCUSSION

The Yeamans say the judge should have let the jury's verdict stand.  H&B, of course, claims the judge simply applied the law.  It also provides an alternative basis for affirming.  It suggests a baseball bat cannot, as a matter of law, be deemed defective for

---

[15] The district judge also decided the Yeamans had failed to show causation on either the defective design or failure to warn claim.  Given our resolution of the case, we need not address the causation element.

hitting a ball too well because that is its intended purpose. We address the latter argument first.

A.     Defective as a Matter of Law

A bat's purpose is to propel a baseball. Indeed, consumers gauge the desirability of a bat on how well it performs that function. According to H&B, a bat cannot be defective, as a matter of law, when it performs that function too well. "Just as a Boy Scout knife is not defective because had it been duller it would not have cut a hand, a bat is not defective because it could have been designed to hit the ball softer and slower." (Appellee's Br. at 26 (footnote omitted).) The district judge found this argument "appeal[ing]" but decided it was outside the realm of settled Oklahoma law. (Appellants' App'x, Vol. V at 1281.) We agree.

Under Oklahoma law, a products liability plaintiff must prove, among other things, a defect in the product making it unreasonably dangerous. *Kirkland v. Gen. Motors Corp.*, 521 P.2d 1353, 1363 (Okla. 1974). The jury was instructed: "A product is defective when it is not reasonably fit for the ordinary purposes for which such product is intended or may reasonably be expected to be used." (Appellants' App'x, Vol. III at 839.) It was also told for the Exogrid to be unreasonably dangerous, it "must be dangerous to an extent beyond that which would be contemplated by a person who might be reasonably expected to be affected by the bat with the ordinary knowledge common to baseball players."[16] (Appellants' App'x, Vol. III at 840.) *See Kirkland*, 521 P.2d at

_____

[16] These instructions derive from Instruction Nos. 12.2 and 12.3 of the Oklahoma

(Continued . . . )

- 12 -

1362-63. This is referred to as the consumer expectations test. *Lamke v. Futorian Corp.*, 709 P.2d 684, 686 (Okla. 1985); *see also Braswell v. Cincinnati Inc.*, 731 F.3d 1081, 1087 (10th Cir. 2013).

In *Lamke*, Lamke suffered severe burns when her cigarette fell and ignited the sofa upon which she was sitting. 709 P.2d at 685. She brought a products liability action against the cigarette manufacturer. *Id.* She claimed the cigarette was unreasonably dangerous because it had special paper that prolonged its burning and increased the intensity of the cigarette's fire; she also argued the cigarette should have been self-extinguishing. *Id.* at 686. Applying the consumer expectations test, the Oklahoma Supreme Court concluded the cigarette was not unreasonably dangerous because Lamke had failed to show a defect in the cigarette rendered it less safe than expected by the ordinary consumer:

> This is particularly true in cases such as the instant case where the "defect" alleged is the failure to minimize an obvious danger which is inherent in the product itself. In order for a cigarette to be used, it must burn. The simple allegation that the cigarette should have been self-extinguishing or that some other cigarettes would not have burned as long, nor as intensely, does not establish that the cigarettes involved in this case were more likely to cause the fire than might be expected by the consumer.

*Id.*

Similarly, in *Wheeler v. HO Sports, Inc.*, Wheeler's husband drowned while wakeboarding wearing a life-vest sold by the defendant. 232 F.3d 754, 756 (10th Cir.

---

Uniform Jury Instructions—Civil. Neither side raises any objections to the jury instructions.

- 13 -

2000). Wheeler sued claiming, *inter alia*, the vest was defective because it contained less flotation material (7.1 pounds) than necessary to float an average person (10 pounds). *Id.* at 758. But the vest was not designed for use by the average person; rather, it was designed for use by the experienced wakeboarder, one who is willing to forego some degree of flotation for enhanced mobility. *Id.* Thus, "[p]laintiff's assertion that the vest was not designed to function as an ordinary life vest is answered squarely by the fact that the vest was not designed to be an ordinary vest." *Id.* We concluded (under Oklahoma law) Wheeler had failed to show the vest's design made it unreasonably dangerous for its intended purpose, i.e., "that ordinary consumers expect more than 7.1 pounds of flotation material in this type of vest." *Id.* at 758.

*Lamke* and *Wheeler* are not helpful. In neither case did the court hold a*s* <u>a matter of law</u> the product could never be considered unreasonably dangerous when the injuries occurred due to a "defect" inherent in the product itself (a cigarette) or when used for its intended purpose (life-vest for experienced wakeboarders). Rather, the courts determined the relevant products were not defective under the consumer expectations test.

A closer case is *Atkins v. Arlans Dep't Store of Norman, Inc.*, 522 P.2d 1020 (Okla. 1974). Ten-year-old Brett misthrew a lawn dart, hitting twelve-year-old Thomas in the eye. *Id.* at 1021. Thomas and his parents brought a products liability action against the manufacturer of the lawn dart game. *Id.* at 1020. They said the manufacturer "designed and manufactured a weighted projectile with a sharp metal shaft protusion possessing the inherently dangerous capability of penetration of the human body and the

skull and was therefore unsafe for its intended use." *Id.* at 1021 (quotations omitted).

The court decided:

> [T]he dart was not dangerous to the extent beyond that which would be contemplated by the ordinary consumer with the ordinary knowledge common to the community as to its characteristics.
>
> There are many toys and playthings, perfectly harmless and inoffensive in themselves, but whose common use can be perverted into a dangerous use or design, and there are very few of the most harmless toys which cannot be used to injure another. The dart's propensities to cause injury is demonstrated by the injury sustained but the fact that an injury was sustained does not necessarily mean that the manufacturer or retailer are liable for those injuries.

*Id.* at 1022. It relied on two Illinois court decisions, one involving an air dart and the other a boomerang. *Id.* at 1021. Both courts said toys, such as baseballs, baseball bats, and darts, cannot be categorized as dangerous instrumentalities even though they have the capacity to injure the user or others in the course of their ordinary use. *Id.*

*Atkins*' reliance on the Illinois cases could be interpreted as its adoption of a per se rule: baseball bats cannot be considered unreasonably dangerous as a matter of law, at least when the alleged defect is they perform their intended function too well. But that stretches *Atkins* too far. Like *Lamke* and *Wheeler*, the court applied the consumer expectations test to conclude the lawn dart was not unreasonably dangerous.

Moreover, as the Yeamans point out, *Atkins* was decided in 1974; the Illinois cases relied on by *Atkins* in 1966 and 1967. As the evidence at trial bore out, the baseball bat has substantially evolved since then.[17] Thus, as the district judge aptly stated: "[I]t is

---

[17] H&B made its first baseball bat in 1884. The first bats it manufactured were

(Continued . . . )

quite easy to accept the proposition that there is, at least conceptually (whether or not within the realm of actual design capability), some upper limit of acceptable performance of a bat . . . ." (Appellants' App'x, Vol. V at 1281.) Maurice Archer, the President of H&B's Louisville Slugger Division at the time the Exogrid was developed, admitted so. And Bill Clark, the President of the Louisville Slugger Division at the time of trial, conceded a pitcher should be allowed enough time to react to a batted ball. Moreover, by adopting standards governing (and limiting) the performance of non-wood baseball bats, the regulators of college and youth baseball seem to suggest a baseball bat could be too powerful to be used safely in the sport.[18]

Finally, H&B relies on cases from other circuits involving the enhanced performance of BB guns. *See Moss v. Crosman Corp.*, 136 F.3d 1169, 1173-75 (7th Cir. 1998) (enhanced muzzle velocity); *Marzullo v. Crosman Corp.*, 289 F. Supp. 2d 1337 (M.D. Fla. 2003) (same). In considering a failure to warn claim, the *Moss* court concluded the BB gun was not unreasonably dangerous because it "did not place users at risk of injuries different in kind from those an average consumer might anticipate" and

---

made from wood. In 1974, the NCAA first allowed aluminum bats to be used in collegiate baseball games. Several years later, H&B began manufacturing aluminum bats. The aluminum bat has evolved from a pure aluminum bat to a bat consisting of both aluminum and composite materials. Indeed, the Exogrid is made of both aluminum and a carbon composite. Thus, it is technically improper to refer to the Exogrid or any metal bat as an aluminum bat; these bats are more appropriately referred to as "non-wood" bats.

[18] Metal bats are not allowed to be used by professional baseball players. Interestingly, one of the main reasons the NCAA began allowing metal bats to be used in collegiate play was economics—wood bats break and have to be replaced.

the evidence "overwhelmingly [showed] the average person in the community knew the general kind of physical risk posed by a BB gun." 136 F.3d at 1175. Similarly, the *Marzullo* court held the muzzle velocity of a BB gun "is not, as a matter of law, a design defect and is not a defective condition." 289 F. Supp. 2d at 1342. These cases are not binding in Oklahoma. Moreover, as the district judge aptly observed—BB guns are not normally used on other people whereas baseball bats are designed to propel a ball directly at human beings. Thus, "[t]he analogy . . ., though instructive, is not perfect." (Appellants' App'x, Vol. V at 1281.)

It is not clear, as a matter of Oklahoma law, that a baseball bat cannot be considered unreasonably dangerous for propelling a ball too fast.[19] Rather than speculate, we can affirm on other grounds, to which we now turn.

B.      Judgment as a Matter of Law

We review de novo a district court's grant of a motion for judgment as a matter of law. *Bannister v. State Farm Mut. Auto. Ins. Co.*, 692 F.3d 1117, 1126 (10th Cir. 2012). We will affirm if "a reasonable jury would not have had a legally sufficient evidentiary basis to find for" the Yeamans on their claims. *Id.* (quotations omitted). In conducting

---

[19] H&B says a ruling in its favor on this ground is important because it would broadly preclude as a matter of law "ill-conceived claims of 'over-performing' bats," like those raised by the Yeamans. (Appellee's Br. at 24.) But in diversity cases, like this one, our task is "simply to ascertain and apply the state law." *Kokins v. Teleflex*, Inc., 621 F.3d 1290, 1304 (10th Cir. 2010) ("It is axiomatic that state courts are the final arbiters of state law.") (quotations omitted). If H&B wanted such a ruling, it could have kept the case in Oklahoma state court, where it was originally brought, rather than removing it to federal court.

our review, we "construe the evidence and inferences most favorably to the nonmoving party, and refrain from weighing the evidence, passing on the credibility of witnesses, or substituting our judgment for that of the jury." *Id.* (quotations omitted). In diversity cases, like this one, federal law dictates whether judgment as a matter of law is appropriate but "we examine the evidence in terms of the underlying burden of proof as dictated by state law," in this case, Oklahoma law. *Id.* (quotations omitted).

1. Design Defect Claim

Oklahoma law requires a plaintiff in a products liability action to prove: (1) the defective product was the cause of the injury; (2) the defect was in the product at the time it left the manufacturer's possession and control; and (3) the defect made the product "unreasonably dangerous" to the consumer. *Kirkland*, 521 P.2d at 1363. Unreasonably dangerous means "[t]he article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics" (the consumer expectations test). *Id.* at 1362-63 (adopting definition of Restatement (Second) of Torts § 402A). Evidence a product could be made "safer" does not establish it was less safe than would be expected by an ordinary consumer. *Woods v. Fruehauf Trailer Corp.*, 765 P.2d 770, 775 (Okla. 1988). Moreover, the mere fact an accident occurs creates no presumption the product was defective. *Kirkland*, 521 P.2d at 1363.

The Yeamans complain the district judge erroneously required evidence comparing the Exogrid to an "acceptable" bat and laboratory tests measuring the performance of the Exogrid. They say neither is required under Oklahoma law. Rather, according to them, the consumer expectations test is a flexible one and simply asks whether the product's dangers are beyond that which an ordinary consumer would contemplate. The Yeamans allege their evidence showed an ordinary consumer, in this case a fifteen-year-old pitcher, expects a bat to hit a ball at such a speed as to allow him sufficient time to react to it, and the Exogrid did not satisfy this standard because it allowed Hyde to hit a ball at a speed too fast for Dillon to defend himself.[20] Thus, according to the Yeamans, the jury reasonably found the Exogrid was unreasonably dangerous and the judge erroneously set aside the jury's verdict.

The Yeamans misinterpret the trial judge's decision. He did not say Oklahoma law requires comparison or laboratory testing in all instances. Rather, he properly looked to the theory advanced by the Yeamans. *See, e.g., Bohnstedt v. Robscon Leasing LLC*, 993 P.2d 135, 136 (Okla. Civ. App. 1999) (construction worker killed when motor grader backed over her; while defendant argued its motor grader was not defective because

---

[20] Yet they declined to say at oral argument that any bat which could hit the ball at a speed giving the average fifteen-year-old pitcher insufficient time to react to it is unreasonably dangerous.

someone had tampered with the motor grader's reverse warning alarm, plaintiff's theory was the motor grader was defective because its alarms were easily tampered with and such tampering was foreseeable to defendant).  The Yeamans contended the Exogrid is unreasonably dangerous because it hits the ball "too fast," i.e., it allows a batter to hit a ball at a speed (the ball exit speed) which does not allow an average fifteen-year-old pitcher the time he needs to react to the ball to avoid being hit.  Accordingly, Oklahoma's consumer expectations test requires the Yeamans to show the ball exit speed produced by the Exogrid renders it dangerous or less safe than expected by the ordinary consumer. Logically then, they had to establish (1) the ball exit speed reasonably expected by the ordinary baseball bat consumer (what the district judge referred to as an "acceptable bat") and (2) the ball exit speed of the Exogrid.  (Appellants' App'x, Vol. V at 1282.)  Only with this evidence could the jury rationally determine whether the Exogrid was unreasonably dangerous because it hit the ball beyond that contemplated by the ordinary baseball bat consumer.  (Appellants' App'x, Vol. V at 1282.)  Their evidence fell short.

As noted above, several lay witnesses testified to aluminum bats, in particular BESR-certified bats, having more pop than wood or BBCOR-certified bats.  In other words, a ball can be hit farther and faster with a BESR-certified bat than with a wood or BBCOR-certified bat.  But, even assuming the ball exit speed of a wood or BBCOR-certified bat is what is reasonably expected by the ordinary consumer, these witnesses failed to present any objective evidence quantifying the ball exit speed of the various bats.

The Yeamans' experts did not fill the gap. While Coleman explained the Exogrid's design resulted in maximum trampoline effect and the evidence at trial showed the trampoline effect does not occur with wood or BBCOR-certified bats, Coleman did not test the ball exit speed of a wood or BBCOR-certified bat. He admitted he could have but was never asked to do so. Neither did Kent conduct any such testing.

The Yeamans also failed to present any evidence establishing the ball exit speed of the Exogrid. Several eye-witnesses testified they had never seen a ball hit as hard or as fast as the one hit by Hyde. Dillon himself testified the ball was hit so fast he did not have time to react. None of these lay witnesses, however, quantified the exit speed of the ball.[21]

---

[21] Nor could they. H&B moved to exclude any opinions from lay eye-witnesses regarding whether Dillon had sufficient time to react to the ball. The district judge ruled such testimony was admissible if the necessary foundation was established, i.e., the witness actually observed the incident and had a good understanding of the game of baseball, in particular, the Pure Prairie League level of play. In so ruling, the judge relied, in part, on the proposition that lay witnesses may offer their opinion on matters such as the speed of a vehicle. *See, e.g., Gust v. Jones*, 162 F.3d 587, 595 (10th Cir. 1998); *United States v. Carlock*, 806 F.2d 535, 552 (5th Cir. 1986); *Jordan v. Great W. Motorways*, 2 P.2d 786, 788 (Cal. 1931); *St. Louis –San Francisco Ry. Co. v. Fox*, 359 P.2d 710, 713 (Okla. 1961). But we appreciate a discernable difference in estimating the speed of a vehicle and estimating the speed of a baseball traveling less than sixty feet in less than one second. And when reaction time is measured in milliseconds it is hard to imagine how the average lay witness sitting in the bleachers could offer comparative testimony meeting any of the requirements of Rule 701 of the Federal Rules of Evidence—rationally based on perception, helpful in determining a fact and not based on specialized knowledge. Scientific testing was necessary to establish the critical speeds and times in this case, events well beyond the ken of almost every lay witness. Even an extraordinarily gifted lay witness would have to be strategically located in order to offer anything close to a useful opinion. The lay opinion evidence appears to be little more than partisan cheerleading.

Coleman said the Exogrid's stiff handle and flexible barrel maximizes its trampoline effect which in turn results in greater ball exit speed. However, he did not test the Exogrid to determine its ball exit speed. Again, he admitted such tests could have been done but it was simply not his role to do so.

Kent did opine as to the exit speed of the ball which hit Dillon—100 to 105 mph. However, he did not consider or rule out other causes contributing to the speed. As the evidence at trial bore out, and as Kent himself admitted at the *Daubert* hearing, numerous variables, besides the performance of the bat, affect how fast a ball exits a bat. These factors include, among other things, the speed and type of pitch and the ability and swing speed of the batter. Kent's testimony simply estimates the ball exit speed in a unique event on a certain day in June 2006, not the ball exit speed produced by the Exogrid in general.

In sum, without any objective evidence as to the ball exit speed expected by the ordinary baseball bat consumer or the ball exit speed produced by the Exogrid, there was no basis for a rational jury to reasonably find the Exogrid to be dangerous beyond that expected by the ordinary bat consumer.[22] The district judge did not err in correcting the

---

[22] The Yeamans rely on a district court case and state court cases from Montana and California in which pitchers prevailed in products liability actions against H&B after they suffered serious injury or death from a ball struck with a non-wood bat manufactured and designed by H&B. *See Brett v. Hillerich & Bradsby Co., d/b/a Louisville Slugger*, Case No. CIV-99-981-C (W.D. Okla. Jan. 24, 2002); *Patch v. Hillerich & Bradsby Co.*, 257 P.3d 383 (Mont. 2011); *Sanchez v. Hillerich & Bradsby Co.*, 128 Cal. Rptr. 2d 529 (Cal. Dist. Ct. App. 2002). *Sanchez* is distinguishable. It merely determined summary judgment was inappropriate; it involved an incident which

(Continued . . . )

- 22 -

jury's verdict based on defective design.[23]

<hr>

occurred after the NCCA had adopted rules to decrease the ball exit speed of non-wood bats but before the rules were implemented, and the plaintiffs' evidence included the testimony of the bat's designer who said the bat allowed a batter to hit balls at speeds in excess of that which would allow a pitcher sufficient time to react. *Sanchez*, 128 Cal. Rptr. 2d at 707, 709, 713-15. In *Patch*, the jury found the bat was not designed defectively but concluded H&B was liable for failing to warn of the enhanced risks associated with the bat's use. 257 P.3d at 243. While the court noted the evidence demonstrated Patch had 376 milliseconds to react to the batted ball when he needed 400 milliseconds, whether this evidence was sufficient to establish the bat was defective or unreasonably dangerous was not before the court. *Id.* at 243 n.2, 244-51. Finally, in *Brett*, the jury returned a verdict in favor of the plaintiffs on a defective design claim. Case No. CIV-99-981-C at 1-2. It appears the evidence in that case was similar to that presented here but did not include any expert testimony. *Id.* at 5-7. Nevertheless, the district court denied H&B's motion for judgment as a matter of law. *Id.* at 8. *Brett* appears to have been wrongfully decided and entitled only to a place in ether of anomalous results.

[23] If, as we hold, the district judge is correct, the Yeaman's claim to be entitled to a new trial. They cry havoc—the judge provided them no notice prior to trial (when they could have done something to fix it) they would be required to conduct laboratory testing of the Exogrid and compare it to an "acceptable bat." We are not persuaded. The cases they rely on (1) are misstated, *see Walker v. Kelly*, 593 F.3d 319, 331 (4th Cir. 2010) (affirming the district court, not remanding for lack of fair notice), (2) involve a change in the legal standard applicable to the case, *see United States v. Pacheco*, 434 F.3d 106, 115-17 (1st Cir. 2006) (the district court narrowed the criminal charges to a "spoke" conspiracy but instructed the jury on a "hub" conspiracy); or (3) involve a change in the law while the case was on appeal, *see Lee Cnty. Branch of NAACP v. City of Opelika*, 748 F.2d 1473, 1479-81 (11th Cir. 1984) (significant change in law after trial). Here, the district judge did not change the legal standard applicable to the case nor did the law change. The Yeamans knew at all times their burden of proof; their evidence failed to meet it.

Moreover, at the summary judgment hearing, the judge specifically asked the Yeamans' counsel:

What will be your objective evidence—and I use the word "objective" advisedly. I'm not talking about coaches saying, gosh, almighty, that bat really makes that ball fly fast. That's subjective.

What will be your objective evidence that this bat significantly increased the risk to the pitcher beyond that which was already inherent in the game? (Appellants' App'x, Vol. VI at 1421.)

(Continued . . . )

- 23 -

## 2.       Failure to Warn

The district judge recognized some inconsistency in Oklahoma law regarding the failure to warn, specifically, whether a product must be unreasonably dangerous or have dangerous characteristics in order to trigger the duty to warn or whether a failure to warn in and of itself can render a product unreasonably dangerous. *Compare Edwards v. Basel Pharm.*, 933 P.2d 298, 301 (Okla. 1997), *with Duane v. Okla. Gas & Elec. Co.*, 833 P.2d 284, 285-86 (Okla. 1992). Relying on Oklahoma's uniform jury instructions, he concluded the product must have dangerous characteristics in order for the manufacturer to have a duty to warn. The jury was so instructed. Again, neither side contests the jury instructions given.

For the same reasons they believe the judge erred in concluding they had failed to show the Exogrid was unreasonably dangerous, the Yeamans claim he erred in concluding there was insufficient evidence to conclude the Exogrid did not have a dangerous characteristic triggering the duty to warn. But, for the same reasons the Yeamans failed to show the Exogrid was unreasonably dangerous, they failed to show it had a dangerous characteristic. The duty to warn was not triggered and the jury's verdict in favor of the Yeamans on this claim cannot stand.

The judge also informed the Yeamans he had "serious concerns" with the case, was not particularly in agreement with the district court decision in *Brett*, *see supra* n.22, and denied summary judgment with "some serious misgivings." (Appellants' App'x, Vol. VI at 1431-32.) He repeated his concerns at the close of the Yeamans' evidence (outside the presence of the jury). It is disingenuous for the Yeamans to now claim they had no notice.

**AFFIRMED.** We **GRANT** the Yeamans' motion to file Volumes XII-XVII of

the appendix under seal.[24]

Entered by the Court:

**Terrence L. O'Brien**
United States Circuit Judge

---

[24] While the Yeamans' motion only seeks to seal Volumes XIII-XVII, it is clear they meant to include Volume XII. The materials sought to be sealed are: (1) Dillon's medical records which are not readily amenable to redaction, (2) materials from the NCAA which were provided pursuant to a confidentiality agreement among the parties, and (3) H&B's trade secrets. Although we have a strong policy against sealing of the record, the limited sealing requested in this case is appropriate. The materials are not necessary to an understanding of the facts, arguments, or our decision.